United States District Court
Northern District of California

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **SINGLE TOUCH INTERACTIVE, INC.,** | Case No.: 12-cv-831 YGR |
| Plaintiff, | **CLAIM CONSTRUCTION ORDER** |
| vs. | |
| **ZOOVE CORPORATION,** | |
| Defendant. | |

Plaintiff Single Touch Interactive, Inc. ("SITO") alleges that it is a provider of mobile media services to retailers, advertisers and consumers. The two patents involved in this litigation relate generally to systems and methods for the request and dissemination of information to cellular phones. On February 13, 2013, the parties provided a technology tutorial and on February 20, 2013, the Court held a claim construction hearing. Following the hearing, the parties submitted revised proposed constructions for two terms. (Dkt. No. 57.) In total, the parties have requested the Court to construe thirteen[1] claim terms/phrases organized into seven groups, arising from two patents:

1. "access code" / "specialized access code" -- '716 Patent: 1, 8, 10, 45, '341 Patent: 1, 8, 10, 45;

2. "customer identification"/ "customer identifier" – '716 Patent: Claims 1, 8, 10, 45,'341 Patent: Claims 1, 8, 10, 45;

3. "fulfillment center" -- '716 Patent: 1, 8, 10, 45; '341 Patent: 1, 8, 10, 45;

4. "information beyond customer identification" / "information other than customer identification" -- '716 Patent: 1, 8, 10; '341 Patent: 1, 8, 10;

---

[1] In their briefing, the parties presented the additional terms "route"/"routing" for construction. At the hearing, the parties stated that they had stipulated to definitions for "route" and "routing" and agreed that Zoove could incorporate elements from its proposed construction for these terms into its construction of "wireless switch" instead. (TR. 96:11-15, 96:24-97:5.) Based upon the agreement as stated on the record, and upon the parties' Joint Statement filed February 27, 2013 (Dkt. No. 57), the Court will not construe the terms "route" and "routing."

5. "product identifier" / "advertiser identifier" -- '716 Patent: 45; '341 Patent: 45;

6. "wireless network" / "wireless telecommunications network" / "public wireless telecommunications network" -- '716 Patent: 1, 8, 10; '341 Patent: 10; and

7. "wireless switch" -- '341 Patent: 1, 8, 10.

Based upon the papers submitted, the admissible evidence,[2] the arguments of counsel, and for the reasons stated below, the Court construes the claims as follows:

| DISPUTED CLAIM TERM/PHRASE | CONSTRUCTION |
|---|---|
| "access code" / "specialized access code" | *Abbreviated dialing code to access a fulfillment center/system* |
| "customer identification"/ "customer identifier" | *information that identifies the cellular telephone accessing the system and the customer associated with the particular device.* |
| "fulfillment center" | Does not require construction |
| "information beyond customer identification" / "information other than customer identification" | The Court declines to construe due to insufficient information. |
| "product identifier" / "advertiser identifier" | *an alphanumeric code to select a particular advertiser/product that is input after the access code.* |
| "wireless network" / "wireless telecommunications network" / "public wireless telecommunications network" | Court cannot construe based on current record and revisions |
| "wireless switch" | *a processor in a cellular telecommunications network that can recognize the caller's identity; recognize the access code and compare it to entries in a database of approved codes; and determine a route for the communication.* |

---

[2] SITO submitted two declarations by its expert, Dr. Robert Akl. Zoove objects to both declarations: the first because his opinions are conclusory, outside the proper scope of expert testimony, and made without demonstrating he is qualified to offer expert testimony; and the second because it is new evidence offered for the first time on reply. Zoove's objections are SUSTAINED. The original declaration is impermissibly conclusory and does not establish why Dr. Akl should be considered a person skilled in the art pertinent to the Patents. The reply declaration's belated attempt to cure these defects fails. The Court has not considered either declaration of Dr. Robert Akl in ruling on the claims construction herein. SITO's motion, filed at Docket No. 52, for leave to file a response to the new evidence submitted on reply is DENIED as moot.

**BACKGROUND**

The patents-in-suit are U.S. Patent Nos. 7,813,716 ("'716 Patent") and 8,041,341 ("'341 Patent") (collectively, "the Patents"). The Patents contemplate the use of a "wireless telecommunications transmitting and receiving device" (which the parties agree is a "cellular telephone") to enter manually or automatically an "access code" to be routed through a wireless network to reach a fulfillment center. Upon reaching the fulfillment center, information corresponding to a code entered by the cellular telephone is provided back to the cellular telephone. According to the specification of the Patents, the impetus for the invention was the desire of advertisers to reach prospective customers while those customers were travelling. (*See, e.g.,* '716 Patent, 1:43-61.) The Patents identify the problems with technology that existed at the time of the first filing of these patents, including the high cost and lack of personalization for radio advertising and the inability to provide targeted and detailed information through billboards or other visual media. (*See id.*)

The '716 Patent, issued October 12, 2010, is entitled "Method of Providing Information to a Telephony Subscriber." The '341 Patent, issued just one year later on October 18, 2011, is entitled "System of Providing Information to a Telephony Subscriber." Both patents were continuations of applications dating back to June 7, 1995, and therefore claim priority as of that date. As a result, the disputed terms identified herein must be construed as of that date.

The '716 Patent is described in its Abstract as teaching "[a]n information fulfillment system and method for providing information to a caller having a wireless communication device." ('716 Patent at 1.) The system and method are described as follows: "[u]pon manual or automatic input of access codes to the wireless communication device, the caller's identity and the input access code are verified [and t]hereafter, the call is connected through the wireless network to the system messaging or fulfillment center for automatic or live-operator delivery of the requested information." ('716 Patent, p.1.) The Abstract further indicates that the '716 Patent sets forth "[a]utomatic verification, connection, and billing modification processes… for implementation of the system and method." (*Id.*) The '341 Patent abstract similarly states that the invention is "[a]n information fulfillment

system [that] provides information to a caller having a wireless communication device" and is otherwise identical to the '716 Patent's Abstract.

### PRINCIPLES OF CLAIM CONSTRUCTION

Claim construction is a matter of law, to be decided by the Court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 387 (1996) (determination of infringement is a two-step analysis: first, the court determines the scope and meaning of the claims; second, the properly construed claims are compared to the accused device.). "[T]he role of a district court in construing claims is… to give meaning to the limitations actually contained in the claims, informed by the written description, the prosecution history if in evidence, and any relevant extrinsic evidence." *American Piledriving Equipment, Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1331 (Fed. Cir. 2011). "Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Thus, claim terms need only be construed "to the extent necessary to resolve the controversy." *Wellman, Inc. v. Eastman Chemical Co.*, 642 F.3d 1355, 1361 (Fed. Cir. 2011) (citing *Vivid Technologies, Inc. v. American Science & Engineering, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).[3]

The starting point in a claims construction analysis is the language of the claims themselves. The claim language defines the invention that the patentee may exclude others from practicing. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005). A court must construe a claim term in a manner consistent with its "ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1312.

---

[3] Once the meaning of a term used in a claim has been determined, the same meaning applies to that term for all claims in which the same term appears. *Inverness Med. Switzerland GmbH v. Princeton Biomeditech Corp.*, 309 F.3d 1365, 1371 (Fed. Cir. 2002). After a term is construed, the Court's construction becomes the legally operative meaning of the disputed terms that governs further proceedings in the case. *See Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1377 (Fed. Cir. 2005). However, "district courts may engage in a rolling claim construction, in which the court revisits and alters its interpretation of the claim terms as its understanding of the technology evolves." *Pressure Products Medical Supplies, Inc. v. Greatbatch Ltd.*, 599 F.3d 1308, 1316 (Fed. Cir. 2010).

Claims must be read in view of the specification, of which they are a part and in a manner consistent with such patent's specification. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). The specification may act as a sort of dictionary, explaining the invention and defining terms used in the claims. *Id.* A court also should consider the patent's prosecution history, if it is in evidence. *Id.* at 980. The prosecution history may "inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317 (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582-83 (Fed. Cir. 1996)); *see also Chimie*, 402 F.3d at 1384 (prosecution history aids claim construction in that any interpretation that was disclaimed during prosecution should be excluded).

"There is a fine line between construing the claims in light of the specification and improperly importing a limitation from the specification into the claims." What courts should strive to do, therefore, is to "capture the scope of the actual invention, rather than strictly limit the scope of claims to disclosed embodiments or allow the claim language to become divorced from what the specification conveys is the invention." *Retractable Technologies, Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011). The specification may also specify features of the preferred embodiment that are "essential," "central," "crucial" or otherwise important to the claimed "invention." In such cases, "[w]hen a patent [specification] thus describes the features of the 'present invention' as a whole, this description limits the scope of the invention." *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007). To properly construe the claims, examining the specification is important to determine both the context in which the claim language is used and whether the patentee has specifically defined or otherwise limited the scope of the claims. *See Watts v. XL Systems, Inc.*, 232 F.3d 877, 882-84 (Fed. Cir. 2000). As the Federal Circuit has explained, "claims may be no broader than the supporting disclosure, and therefore…a narrow disclosure will limit claim breadth." *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1480 (Fed. Cir. 1998).

# DISCUSSION

**I.**     **FIRST DISPUTED TERM: "ACCESS CODE" / "SPECIALIZED ACCESS CODE"**

**A.**     **BACKGROUND**

Independent Claim 1 of the '716 Patent is one of several claims that includes the disputed term "access code"/"specialized access code."  Claim 1 recites the following (the language the parties have identified for construction is in bold and italics):

> A method for providing information from a fulfillment center through a wireless network to a wireless telecommunications transmitting and receiving device comprising the steps of: receiving a communication from the wireless telecommunications transmitting and receiving device, said communication comprising a **specialized access code** and initiated through inputting by a customer of said **specialized access code** into the wireless telecommunications transmitting and receiving device wherein the **specialized access code** has fewer characters than an ordinary telephone number and comprises a non-alphabetic/nonnumeric character as a first character, and wherein the communication further includes information regarding the customer including both customer identification and information beyond customer identification.

'716 Patent, 13:45-60 (emphasis added).  SITO contends that these two terms should be treated as synonymous and offers a single construction for both.  Zoove contends that "access code" and "specialized access code" must mean different things.  Indeed, Zoove argues that the term "access code" has an ascertainable meaning while "specialized access code" is indefinite, since nothing in the Patents or their file histories explains the meaning of "specialized access code."[4]

| *SITO Construction* | *Zoove Construction* |
|---|---|
| "code to access the fulfillment center." | access code - "abbreviated dialing code to access a fulfillment system such as '*500,' but which does not identify or correlate to an advertiser or product." |
| | The term "specialized access code" is indefinite.  However, should the Court find that the term is not indefinite, in the alternative, Zoove proposes that it be construed the same as "access code." |

---

[4] However, Zoove does offer, in the alternative, a proposed construction identical to its proposal for "access code."

**1.     *Indefiniteness***

Generally speaking, indefiniteness is an issue of patent validity. A party seeking to establish invalidity must do so by clear and convincing evidence under 35 U.S.C. § 112, ¶ 2. *Technology Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1338 (Fed. Cir. 2008). Zoove contends that the indefiniteness here can be established from the face of the patent and prosecution history, without further evidence. However, "[c]laim definiteness is analyzed 'not in a vacuum, but always in light of the teachings of the prior art and of the particular application disclosure as it would be interpreted by one possessing the ordinary level of skill in the pertinent art.'" *Energizer Holdings, Inc. v. International Trade Com'n*, 435 F.3d 1366, 1370 (Fed. Cir. 2006) (internal citations omitted). "[I]ndefiniteness [is determined] according to an objective measure that recognizes artisans of ordinary skill are not mindless 'automatons.'" *Source Search Technologies, LLC v. LendingTree, LLC*, 588 F.3d 1063, 1076-1077 (Fed. Cir. 2009). Zoove contends that a person of ordinary skill in the art reading the patent and prosecution history would be at a loss to say what a "specialized access code" is. However, Zoove offers no evidence to support that contention.

The Court will not decide, in the context of this claim construction motion, that the term "specialized access code" is so indefinite as to be invalid as a matter of law. Procedurally, the motion is one that requires a moving party to establish its position with evidence. Zoove has simply raised the argument in opposition without offering evidence to support it. Further, it appears that there are factual issues that cannot be decided on this record, even if the indefiniteness issue had been raised in a procedurally proper manner. Thus the Court reserves ruling on the indefiniteness question and construes the claim terms in the usual manner without prejudice to any later evidentiary showing of invalidity.

Moreover, the Patents' specification and the prosecution history tend to support SITO's position that "access code" and "specialized access code" are used interchangeably and have the same meaning. The specification of the Patents states: "A sensory input that contains any information that encourages the subscriber to utilize the invention may prompt the customer to initiate a wireless call using the keypad of a cellular telephone to dial or speak a set of digits commencing with *, or some other call prefix such as #, utilizing a *special code*." ('716 Patent, Col. 7:18-23 (emphasis added).) The prosecution history reveals that both the applicant and the examiner

used the terms interchangeably.  (*See, e.g.,* Response to 1/9/2009 Office Action, Exh. H to Response Brief, p. 2 (amended claim 41), p. 17-20 (amended claims use "specialized access code" but remarks regarding prior art references use "access code."); Exh. J [Applicants' Request for Pre-Appeal Brief Review] at p. 2-3 (prior art "does not teach our claimed features of 'providing relevant information from the fulfillment center as . . .  designated by the specialized access code" because none of the references "disclose the use of an access code," or "teach a fulfillment center that uses an access code."; Exh. I at 3 [in considering the limitation "directing the communication via the wireless network to the fulfillment center based upon the specialized access code," the Examiner relied on "specialized access code" in the *Venier* reference and "access code" in the *Morrisey* reference].)

### 2. Construction of the Claim Terms

Zoove argues in the alternative that, if the Court finds that the term "specialized access code" can be construed, it should adopt its proposed construction which indicates a particular type of access code, based on the claim language and the specification.  Here, the '716 Patent contains a glossary that defines the term "access code" as an "[a]bbreviated dialing code to access the system, such as *500." ('716 Patent, 3:50-51.)  Where the inventor explicitly defines a claim term in the specification, "the inventor's lexicography governs." *Phillips,* 415 F.3d at 1316 (citation omitted); *Renishaw PLC,* 158 F.3d at 1249.  Thus the definition of "access code" must hew closely to this internal definition.  Each party attempts to vary from the glossary definition with respect to the construction of "access code."  The parties disagree on a number of points: whether access code may identify an advertiser or product; whether access is to a fulfillment "center" or "system"; and whether the construction must indicate that the code is "abbreviated."  The Court examines each issue in turn.

### a. Does Not Identify An Advertiser or Product

Zoove's proposed construction adds the limitation "does not identify or correlate to an advertiser or product."  The patent claims do not themselves limit "access code" in this way.  While the specification describes secondary codes that identify advertisers and products as being distinct from the access code, the specification does not preclude the "access code" or "specialized access code" from correlating to an advertiser or product.  Zoove argues that the term access code is used consistently, in every example in the specification, to refer to an *initial* code to access the system,

and not to the separate code or identifier needed to obtain the desired advertising or product information.  (*See, e.g.*, '716 Patent at 2:23-62, 6:30-58, 11:38-12:13; Figures 3, 9, 10.)  However, nothing in the specification *precludes* the access code from referring to or correlating with an advertiser or product.

The Court will not read in limitations that are not otherwise supported by the patent language.  While a claim must be read in view of the specification, it is fundamental that "a court may not read a limitation into a claim from the specification." *Innova/Pure Water, Inc.*, 381 F.3d at 1117.  The only time that such limitations can be read into the claims from the specification is if there is a clear intention by the patentee to do so. *See Altiris v. Symantec Corp.,* 318 F.3d 1363, 1372 (Fed. Cir. 2003).  Thus the Court cannot agree that a proper construction must exclude an access code that identifies an advertiser or product.

> b.   *Center v. System*

Zoove contends that the construction of the term "access code" should include the language of the glossary definition, *i.e.* "fulfillment *system,*" while SITO argues the term should be construed as "fulfillment *center.*"  Again, having acted as its own lexicographer, the inventor cannot simply discard the glossary definition.  *Phillips*, 415 F.3d at 1316.  Besides the glossary in the Patent specification, the term "fulfillment system" is used in the Patents' Abstract.  ('716 Patent, Abstract, "[a]n information fulfillment system and method.")  The '716 Patent Abstract provides that:

> Upon receipt of sensory prompting and manual or automatic input of access codes to the wireless communication device, the caller's identity and the input access code are verified. Thereafter, the call is connected through the PWN and along the PSTN to the system messaging or fulfillment center for automatic or live-operator delivery of the requested information.

'716 Patent, Abstract (emphasis added).

On the other hand, there does not appear to be any practical difference between a "fulfillment system" versus a "fulfillment center" as those terms are used in the Patents.  "Fulfillment system" is only used in the glossary and abstract, while the term "fulfillment center" is used throughout the Patents.  (*See, e.g.,* '716 Patent, claim 1, 13:45-48 ["[a] method for providing information from a fulfillment *center*"]; *id.* at Abstract ["[u]pon receipt of . . . input of access codes . . . , the caller's identity and the input access code are verified. Thereafter, the call is connected . . . to the system

1   messaging or fulfillment *center* for automatic or live-operator delivery of the requested

2   information"]; *id.* at 1:23-26 ["The system includes one or a plurality of wireless or cellular

3   telephone users connected . . . to a central or regional messaging and fulfillment *center*."].)  Claim 1

4   provides "[a] method for providing information from a fulfillment center." ('716 Patent, 13:45-48.)

5   As Claim 1 continues, the Patent is explicit that the purpose of the "specialized access code" is to

6   access the fulfillment *center*.  ('716 Patent, col. 13:49-65 "directing the communication via the

7   wireless network to … the fulfillment center based upon the specialized access code; providing

8   relevant information from the fulfillment center. . . as designated by the specialized access code.").

9         In short, the terms "center" and "system" appear to have been used interchangeably in the

10  Patents, without regard for any distinction that might otherwise have attached.  Thus the Court finds

11  that a proper construction of "access code" should include both "system" and "center," so as to avoid

12  any confusion between the glossary definition and the manner in which the term is used in the

13  remainder of the Patents.

14              *c.*     *Abbreviated Dialing Code*

15        Zoove argues that a proper construction must indicate that the access code is abbreviated,

16  while SITO contends that "abbreviated" is unnecessary.  Again, the Court starts from the supposition

17  that the glossary definition controls.  That glossary states that the code is an "abbreviated dialing

18  code."

19        SITO contends that including "abbreviated dialing code" in the construction only serves to

20  confuse, since Claim 1 goes on to express the limitations that: (1) the code must be input; (2) it must

21  be shorter than a standard telephone number; and (3) it must begin with a nonalphabetic/non-numeric

22  code, all of which appear after the phrase "wherein" in Claim 1 of the Patents.  (*See, e.g.,* '716

23  Patent, Col. 13: 51, 54.)  Since those limitations are stated in the claim itself, incorporating the

24  limitations in the construction of the term "access code" itself would be redundant.  Zoove, on the

25  other hand, contends that the language following the "wherein" in Claim 1 is definitional of the term

26  "access code," not an additional, separate limitation.[5]

27

28

_____

[5]  The parties were requested to provide additional authority regarding "wherein" clauses, which they filed on February 27, 2013. (Dkt. Nos. 58 and 59.)

When a "wherein" clause "expresses the inventive discovery," rather than just stating a result of certain limitations, it is definitional.  *See Griffin v. Bertina*, 285 F.3d 1029, 1034 (Fed. Cir. 2002); *Intergraph Hardware Technologies Co. v. Toshiba Corp.*, 508 F. Supp. 2d 752, 769 (N.D. Cal. 2007) ("wherein" clause stated limitations that were part of construction rather than expressing result of limitation).  SITO's point appears to be less that these limitations are not definitional, and more that if the construction of "access code" includes them, there will be some redundancy if one simply plugs the definition into the claim context.  The Court finds that "access code" necessarily includes these limitations, based on the glossary, the specification, and Patents as a whole.  Further, there does not appear to be any reason for concern that any redundancy would result in confusion.  In fact, the phrase after the "wherein" clause serves more to refine the limitations than to repeat or contradict anything in about the "abbreviated dialing code" definition.  Therefore, the Court finds that "abbreviated dialing code" is properly included in the construction since it is most consistent with the glossary and with the term's grammatical usage in the claims.[6]

**THE COURT'S CONSTRUCTION:**

Based upon the foregoing, the Court concludes that the terms "access code" and "specialized access code" in the '716 Patent, Claims 1, 8, 10, 45, and the '341 Patent, Claims 1, 8, 10, 45, should be construed as follows:

*Abbreviated dialing code to access a fulfillment center/system*

## II.   SECOND DISPUTED TERM: "CUSTOMER IDENTIFICATION"/ "CUSTOMER IDENTIFIER"

### A.   BACKGROUND

Each of the claims in the Patents contains the requirement that the information be provided based upon the "customer identification" or the "customer identifier."  The parties agree that these terms should have the same construction and that the terms include information that is used to identify someone or something.  They disagree as to what or who is being identified.  As an example of the usage of the term, Claim 1 of the '716 Patent recites the following:

---

[6]  The Court agrees that the phrase "such as *500" is not necessary, since it acts as an exemplar and does not add to the definition.

1.  A method for providing information from a fulfillment center through a wireless network to a wireless telecommunications transmitting and receiving device comprising the steps of:

receiving a communication from the wireless telecommunications transmitting and receiving device, said communication comprising a specialized access code and initiated through inputting by a customer of said specialized access code into the wireless telecommunications transmitting and receiving device wherein the specialized access code has fewer characters than an ordinary telephone number and comprises a non-alphabetic/nonnumeric character as a first character, and wherein the communication further includes *information regarding the customer including both* **customer identification** and information beyond customer identification;

directing the communication via the wireless network to the fulfillment center based upon the specialized access code;

providing relevant information from the fulfillment center as a function, at least in part, of the **customer identification** and information beyond customer identification and further as designated by the specialized access code; and

delivering the relevant information, retrieved based upon, at least in part, the **customer identification** and information beyond customer identification and the specialized access code, from the fulfillment center to the customer through the wireless telecommunications transmitting and receiving device.

'716 Patent, 13:45-14:6 (emphasis added).  Thus, Claim 1 indicates that "customer identification" is one type of "information regarding the customer."

| *SITO Construction* | *Zoove Construction* |
|---|---|
| "information that specifically identifies only one cellular telephone." | "information used for identification of a caller [having a pre-existing relationship with the identifying fulfillment system] to thereby enable, for example, verification of a caller and billing of a caller." |

Zoove's original proposed construction added the concept of "having a pre-existing relationship with the identifying fulfillment system to thereby enable, for example, verification of a caller and billing of a caller."  At the hearing, Zoove conceded that the language "having a preexisting relationship with the identifying fulfillment system" could be eliminated.  (TR 60:15-18.) However, Zoove still argued for a construction that would capture the Patents' stated need to ascertain billing information, since both patents are addressed to the related problems of: (1) providing advertiser information to a caller on a mobile phone, and (2) modifying the billing method

for the mobile phone user in a variety of ways so that the call is free to the prospective customer in most circumstances.  ('716 Patent at Col. 1:20-39, 53-60.).

The main focus of the parties' arguments on this term is whether the "customer identification" is linked to the phone or to the caller.  SITO's position is that what is being identified under the "customer identification" umbrella is the cellular telephone that is using the system and not the actual caller or person utilizing the telephone.  The "customer identification" is not information unique to the user of the phone, but information identifying the phone itself.  Zoove, on the other hand, argues that the claim specification in the Patents demonstrates that the term encompasses not just information identifying the phone, but also information identifying the "customer" or caller using the phone.

The detailed description of the preferred embodiment in the '716 Patent states: "Central to the operation of the inventive system is the functioning of wireless switch **112.**  This switch must recognize *the caller* seeking to utilize the system and must recognize the access code and compare it to entries in a database of approved codes."  ('716 Patent, Col. 4:56-60 [emphasis supplied].)  The specification at Column 9, lines 27-57 of the '716 Patent describes the concept of customer identifier and lists examples of "customer identifier" information.  The specification states:

> [the Mobile Telephone Switching Office or] MTSO first determines whether the received access code is one which the MTSO recognizes as valid.  Assuming validity of the access code, the MTSO next verifies the *caller's* identity and approved access to the system.  One or more of the following identifiers can be verified at the MTSO:…

('716 Patent, Col. 9:32-36, emphasis added.)  The specification then goes on to list a number of different types of information that can be verified to identify the "caller."  The list includes such information as the automatic number identification (ANI) (the phone's telephone number), the mobile identification number (MIN) of the phone, the electronic serial number (ESN) of the phone, the billing number on the account associated with the phone, the subscriber name associated with the phone.  '716 Patent, 9:27-57.  The parties agree that ANI, MIN, and ESN uniquely identify only one phone or device.  However, other items on that same list of "customer identifier" information, such as "Subscriber billing address" and "Subscriber home telephone number," are not specific to the phone itself, but relate more generally to the subscriber *associated with* the device.  The language of the Patent demonstrates that the "customer identifier" information is not limited to the identification

of the phone, but also includes other information associated with, and not necessarily unique to, that

phone or device.

***THE COURT'S CONSTRUCTION:***

Based upon the foregoing, the Court concludes that the term "customer identification"/

"customer identifier" in the '716 Patent, Claims 1, 8, 10, 45, and the '341 Patent, Claims 1, 8, 10, 45,

means:

*information that identifies the cellular telephone accessing the system and the customer*

*associated with the particular device.*

**III.    THIRD DISPUTED TERM: "FULFILLMENT CENTER"**

**A.    BACKGROUND**

Each of the asserted claims of the Patents contains a requirement that the information be

provided to the cellular telephone from the "fulfillment center." Claim 1 of the '716 Patent is

exemplary of the usage of this term wherein it provides as follows:

> [P]roviding relevant information from the **fulfillment center** as a function, at least in part, of
> the customer identification and information beyond customer identification and further as
> designated by the specialized access code

'716 Patent, 13:64-67 (emphasis added).   SITO submits a construction for this term contending that

it is a "coined term" in the patents and therefore requires explanation, while Zoove contends that no

construction is necessary.

| *SITO Construction* | *Zoove Construction* |
|---|---|
| "one or more computing devices that provide information." | No construction proposed. Plain and ordinary meaning |

SITO contends that the term "fulfillment center" should be construed to mean the actual

hardware and software, composed of one or more computing devices, that provides information to a

cellular telephone based on a request for that information.  Zoove argues that SITO's construction is

both over-inclusive and under-inclusive.

Zoove argues it is over-inclusive because "computing devices that provide information"

could be almost anything, including something as simple as a calculator.  More importantly, the

United States District Court
Northern District of California

proposed construction is under-inclusive because it does not account for a variety of "fulfillment centers" discussed in the specification, such as "audiotext service bureaus," or facilities housing "live operators." (*See* '716 Patent col. 6:30-52.)  The definition SITO offers does not capture these embodiments of a fulfillment center as described in the Patents.

SITO points to portions of the patent specification which it contends support a construction limiting fulfillment center to a computer server or system.  ('716 Patent, 12:26-28 ["As appropriate, one or more local servers or one or more remote servers receives call fulfillment information..."].)  However, that language is taken out of the context of the '716 Patent's more detailed description that precedes it:

> When the caller provides an audible identifier for interpretation by speech recognition software at the system's messaging center, inability to recognize an identifier, whether incorrect or unrecognizable for other reasons, will result in a prompt for the caller to repeat the audible identifier.  If still not recognized as correct, the system will prompt the caller to enter the identifier using the phone keypad.  In some instances, a live operator may answer the call and deliver the request for an identifier or trigger a recorded message requesting the identifier.  The operator would then retrieve the advertiser specific files manually or by entry to one of a plurality of networked PC's, 402-404, after hearing the user speak the alphanumeric code.
> [¶] Whether automatically or manually queued, the front end PC's select the relevant advertiser file, deliver the advertiser message and, if necessary, route the call for further processing (e.g., demographics information gathering; sweepstakes entry; caller ordering with attendant information gathering including credit card or other personal account billing verification based upon input provided by the user either by magnetic card reading or secured transmission of alphanumeric information entered by the caller at the time of ordering or preprogrammed into the telephone, which may be conducted directly by an entity at the messaging center or may require transfer of the call to the advertiser's order desk; survey participation, appointment scheduling; etc).  *As appropriate, one or more local servers 406, or one or more remote servers 409, receives call fulfillment information,* as does the system provider server 407 for tracking of system use, advertiser and caller demographics and billing data, etc.

('716 Patent, col. 12:1-31 [emphasis supplied].)  Certainly there may be computers and servers involved in obtaining the relevant information.  However, read in context, the specification indicates that the "fulfillment center" encompasses multiple components, including not only computer hardware and software, but also live operators who may answer calls and manually retrieve the

information associated with a particular code.  Indeed, as SITO conceded at the hearing, that the term "fulfillment center" would encompass a live operator in certain circumstances.  (TR 75:21-76:2.)

The Court must give the term a construction that is as broad as the specification dictates. *Markman,* 52 F.3d at 979; *Phillips,* 415 F.3d at 1317; *Verizon Serv.,* 503 F.3d at 1308.  Here, SITO's proposed construction improperly limits the meaning in ways that are inconsistent with the specification.

Zoove, while arguing against SITO's limited construction, does not offer a competing construction of its own, but instead contends that a jury can rely on the plain and ordinary meaning of the term "fulfillment center."  SITO's argues that "fulfillment center" is not a term that has a plain meaning to one of ordinary skill in the art.  However, neither SITO's argument or its expert's conclusory statement to this effect is persuasive.

Here, the Court finds the term "fulfillment center" can be understood well enough from its use in the context of the claims and specification without further construction.

### THE COURT'S CONSTRUCTION:

Based upon the foregoing, the Court concludes that the term "fulfillment center" in the '716 Patent, Claims 1, 8, 10, and 45; '341 Patent, Claims 1, 8, 10, and 45, does not require construction.

## IV.    FOURTH DISPUTED TERM: "INFORMATION BEYOND CUSTOMER IDENTIFICATION" / "INFORMATION OTHER THAN CUSTOMER IDENTIFICATION"

### A.    BACKGROUND

The parties agree that the terms "information beyond customer identification" and "information other than customer identification" should have the same construction, if they are construed at all.  Zoove contends that the terms are too indefinite to construe, however.  Claim 1 of the '716 Patent is exemplary of the usage of these terms wherein it states as follows:

> [P]roviding relevant information from the fulfillment center as a function, at least in part, of the customer identification and **information beyond customer identification** and further as designated by the specialized access code

'716 Patent, 13:64-67 (emphasis added).

| SITO Construction | Zoove Construction |
|---|---|
| "information other than customer information and other than a[n] [specialized] access code." | These terms are indefinite.<br><br>However, should the Court find that these terms are not indefinite, in the alternative, Zoove proposes: "information that is input separately from customer [identification/identifier] or a[n] [specialized] access code and that consists of an advertiser or product identifier." |

The Patents identify three concepts central to the system and method taught by the patents – an access code, a customer identifier, and "information beyond/other than customer identification," or "IBCI." Zoove argues that SITO's construction of the term, and indeed the term as used in the Patents, essentially encompasses "all the information in the universe" other than "access code" and "customer identification," making it too indefinite to be meaningful.

SITO argues that the patent specification limits IBCI to information regarding the customer, but separate from the customer identifier, and is not "all the information in the universe." However, SITO's examples fail to persuade. For instance, SITO contends that the "identity of a particular cellular carrier on which the cellular telephone is natively used" meaningfully meets the claim's requirements, while not being a customer identifier or an "access code." Similarly, SITO argued at the hearing that "home wireless service provider" is a type of information encompassed by IBCI, because it is information that is not unique to or identifying the particular cell phone. (*Citing* '716 Patent Col. 9:35-55.)

However, as the Court reads the specification, SITO's examples of IBCI are actually the kinds of information that fall under the heading of "customer identification," as discussed above. (*See* Section II, *supra*, discussing "customer identification"; *see also* '716 Patent col. 9:34-56.) The claim itself offers no guidance as to how to distinguish between "customer identification" and IBCI. The language of Claim 1 states that it is teaching a method with the steps of:

> receiving a communication… wherein the communication… includes information regarding the customer including both *customer identification and information beyond customer identification*;
> directing the communication…;
> providing relevant information… as a function, at least in part, of the *customer identification and information beyond customer identification*…; and
> delivering the relevant information, retrieved based upon, at least in part, the *customer identification and information beyond customer identification*.

'716 Patent, 13:45-14:6 (emphasis added).

Similarly, nothing in the specification gives any guidance as to what information is covered by the term IBCI, or how that information is different from the types of information already encompassed within the "customer identification" umbrella.  The specification describes a first step of entering a valid access code, and then verifying the caller's identity and approved access to the system by verifying one or more identifiers, including "Caller Geographic Location. . . Billing Number; Subscriber name; . . . and Home wireless service provider information."  ('716 Patent col.9: 35-54.)  SITO's construction attempts to split the "customer identification" information into different piles of information without any basis in the Patents for doing so.  Thus, the Patents here appear to lack any "objective anchor" that would notify the public of the meaning of the term IBCI, and the patentee's right to exclude others from practicing the invention, making the term fatally indefinite.  *See Datamize,* 417 F.3d at 1347, 1350.

"While negative descriptions of inventions are permissible in some contexts, courts have difficulty with negative descriptions which may be too broad or indefinite." *Purdue Pharma, L.P. v. F.H. Faulding & Co.*, 48 F. Supp. 2d 420, 430 (D. Del. 1999) *aff'd sub nom. Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320 (Fed. Cir. 2000) (citing *Jepson v. Coleman,* 50 C.C.P.A. 1051, 314 F.2d 533, 536 (C.C.P.A.1963); *In re Bankowski,* 50 C.C.P.A. 1548, 318 F.2d 778, 782–83 (C.C.P.A.1963)).  Here, the term IBCI purports to cover an unlimited expanse of information, with no explanation or limitation provided in the specification or otherwise.

However, as indicated above, invalidity generally requires proof by clear and convincing evidence.  35 U.S.C. § 112, ¶ 2; *see also Technology Licensing Corp.*, 545 F.3d at 1338; *Energizer Holdings*, 435 F.3d at 1370.  Thus, the Court does not reach a conclusion on the question of whether the term IBCI is so indefinite as to invalidate the patent.  Rather, the Court declines to construe the term IBCI based upon the information before it.

**THE COURT'S CONSTRUCTION:**

Based upon the foregoing, the Court declines to construe the term IBCI.

//

//

**V.    FIFTH DISPUTED TERM: "PRODUCT IDENTIFIER" / "ADVERTISER IDENTIFIER"**

**A.    BACKGROUND**

The parties next seek construction of the terms "product identifier" and "advertiser identifier" which appear in Claim 45 of the '716 Patent and Claim 45 of the '341 Patent. Claim 45 of the '716 Patent states, in pertinent part, as follows:

> A method of providing services to a customer comprising...
>
> receiving a communication from a telecommunications transmitting and receiving device comprising a specialized access code and information regarding the customer, the information regarding the customer including a customer identifier and at least one of an **advertiser identifier** or a **product identifier**

'716 Patent, 17:10, 18-23 (emphasis added). Claim 45 of the '341 Patent is substantially similar. The parties are in agreement that such an identifier should be an alphanumeric code that represents a product or an advertiser. However, they disagree as to whether this code is one that is "secondary," and whether "secondary" should mean "entered in response to a prompt," as stated in Zoove's proposed construction.

| SITO Construction | Zoove Construction |
|---|---|
| "a one or more digit alphanumeric code representing a [product/advertiser]." | "a secondary alphanumeric code used to select a target [product/advertiser]; 'secondary' means entered in response to a prompt." |

First, the term "advertiser identifier" is defined in the glossary of terms in the specification of the '716 Patent. That definition is:

> Secondary code used to select target advertiser. Also referred to as 'advertiser extension.'

('716 Patent, Col 3: 52-53.) Again, it is a basic principle of claim construction that the patentees' lexicography controls. *See Phillips*, 415 F.3d at 1316; *Renishaw PLC*, 158 F.3d at 1249. Consequently, here, the concept of "secondary" is necessarily part of the construction. However, the word "secondary," on its own, is ambiguous. The Patents contain no express statement of what "secondary" means, or to what the identifier is "secondary."

Zoove argues that "secondary" must mean "entered in response to a prompt." SITO argues that the requirement of inputting, as stated in Zoove's construction, is completely absent from Claim

45, its related dependent claims, and the Patents generally.  The only information that has to be input is the access code and even that is only in certain implementations.  (*See e.g.,* '716 Patent, 13:49-60).  The fact that the specification of the Patents contains examples of "advertiser identifiers" and "product identifiers" being entered in response to a prompt is not limiting.  (*See* '716 Patent, 13:38-43.)  SITO argues that if prompting were a required step, it would have been stated in Claim 45.  SITO did agree at the hearing that "secondary" meant "inpu[t] *after* the access code." (TR 82:14-16.)

Zoove counters that "secondary" is used consistently throughout the specification as meaning "entered in response to a prompt."  For example, in the specification's description of alternative call path routings for different categories of access codes, each of the three alternatives represented at Figure 3 describes the "advertiser identifier" as occurring after "prompting."  ('716 Patent Col. 6: 30-52.)  Likewise, in the '716 Patent's Summary of Invention, the advertiser identifier is an alphanumeric code entered after a prompt.  (Summary of Invention, '716 Patent, Col. 2:35-38, 2:56-60 ["Following the general direction to dial the access code, each individual commercial spot will contain a one or more digit identifying alphanumeric code known as the Advertiser Identifier. . . "[i]n one embodiment, once prospects call *500 or other designated access code, they will hear a short message welcoming them to the system and prompting them to either dial or speak a one or more digit identifier, for example the name of the advertiser or a product name."]; *see also* Col. 11:53-54 [in one embodiment," the caller prompted to provide the advertiser's code at 336."]; Col. 11:62-12:13  [describing components of the fulfillment center as prompting entry of an alphanumeric code and then retrieving advertiser specific files based upon that alphanumeric code].)  Thus, Zoove contends, the term "secondary" has been implicitly defined based on consistent usage within the specification.

"The specification contains a written description of the invention which must be clear and complete enough to enable those of ordinary skill in the art to make and use it."  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  The specification is "always highly relevant to the claim construction analysis…[and] is the single best guide to the meaning of a disputed term." *Id.*  While claim terms are generally given their ordinary meaning, as understood by one of ordinary skill in the art, the patent's specification can either expressly state a different definition, or can give meaning to a term where there is otherwise "no means by which the scope of

the claim may be ascertained from the language used." *Johnson Worldwide Assocs., Inc. v. Zebco Corp.,* 175 F.3d 985, 990 (Fed.Cir.1999); *see also Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001).

A patentee may give a term a particular meaning either expressly, such as by providing a glossary, or implicitly, such as when the specification and preferred embodiments therein dictate the manner in which claims must be construed. *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001) (citing *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.,* 242 F.3d 1337, 1344 (Fed.Cir.2001) and *Vitronics Corp. v Conceptronic,* 90 F.3d 1576, 1582, 1584 n. 6 (Fed. Cir. 1996)). On the other hand, "[l]imitations from the specification… such as from the preferred embodiment, cannot be read into the claims absent a clear intention by the patentee to do [so]." *MySpace, Inc. v. Graphon Corp.*, 756 F. Supp. 2d 1218, 1226 (N.D. Cal. 2010) *aff'd,* 672 F.3d 1250 (Fed. Cir. 2012) citing *Altiris v. Symantec Corp.,* 318 F.3d 1363, 1372 (Fed.Cir.2003) ["resort to the rest of the specification to define a claim term is only appropriate in limited circumstances"]; *Teleflex,* 299 F.3d at 1326 ["The claims must be read in view of the specification, but limitations from the specification are not to be read into the claims."].)

As the Federal Circuit has recognized, "there is sometimes a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification.... [A]ttempting to resolve that problem in the context of the particular patent is likely to capture the scope of the actual invention more accurately than either strictly limiting the scope of the claims to the embodiments disclosed in the specification or divorcing the claim language from the specification." *Decisioning.com, Inc. v. Federated Dept. Stores, Inc.,* 527 F.3d 1300, 1307–08 (Fed.Cir.2008) (quoting *Comark Comm'ns, Inc. v. Harris Corp.,* 156 F.3d 1182, 1186 (Fed.Cir.1998)). The court must "read the specification in light of its purposes in order to determine whether the patentee is setting out specific examples of the invention to accomplish those goals, or whether the patentee instead intends for the claims and the embodiments in the specification to be strictly coextensive." *Id.* (internal citations omitted).

Here, most uses of the term "advertiser identifier" in the specification describe that identifier as being entered after prompting. However, the specification also states that "[t]he use of the above described call path routings allows for minimal access codes to be required by the system and

21

provides for cost efficiency to the system by routing a majority of calls *without prompting of the advertiser code within the PSTN*." ('716 Patent, Col 6:54-58.)  Claim 45 itself does not specify that the advertiser or product identifier be communicated after prompting, but instead is described as part of the "communication" received, along with the access code and customer identifier.  (*See* '716 Patent, Col. 17:18-23, Claim 45: "a communication… comprising a specialized access code and information regarding the customer including the customer identifier and… an advertiser identifier or a product identifier.")

Thus, entering after a prompt does not appear to be a necessary part of the invention and the Court will not read the "prompting" limitation into the claim term.

**THE COURT'S CONSTRUCTION:**

Based upon the foregoing, the Court concludes that the terms "advertiser identifier" and "product identifier" in Claim 45 of the '716 and the '341 Patents shall be construed to mean:

*an alphanumeric code to select a particular advertiser/product that is input after the access code.*

**VI.    SIXTH DISPUTED TERM: "WIRELESS NETWORK"/ "WIRELESS TELECOMMUNICATIONS NETWORK" / "PUBLIC WIRELESS TELECOMMUNICATIONS NETWORK"**

**A.    BACKGROUND**

Claim 1 of the '716 Patent is exemplary of the usage of the term "wireless network," and states, in part, as follows:

A method for providing information from a fulfillment center through a **wireless network** to a wireless telecommunications transmitting and receiving device comprising the steps of. . .
directing the communication via the **wireless network** to the fulfillment center based upon the specialized access code;

('716 Patent, 13:45-48, 61-63 (emphasis added).)

In its briefing, SITO argued that these are simple terms requiring no construction, while Zoove offered detailed proposed constructions.  After the hearing, each party offered revised proposed constructions.  (Dkt. No. 57.)

| SIXTH DISPUTED TERM: "WIRELESS NETWORK"/ "WIRELESS TELECOMMUNICATIONS NETWORK" | |
|---|---|
| *SITO's Construction* | *Zoove's Construction* |
| **Original construction**<br>No construction proposed.<br>Plain and ordinary meaning. | **Original construction**<br>"a [public] wireless [telecommunications] network that includes a wireless switch that must recognize the caller identity, determine the billing status of and modify billing procedures for the caller, and recognize the [specialized] access code and compare it to entries in a database of approved codes." |
| <u>**Revised**</u> **construction:**<br>"a cellular telecommunications network comprising one or more switch(es) and base station(s)." | <u>**Revised**</u> **construction:**<br>"the portion of a telecommunications network that includes one or more cellular towers, one or more base station controllers, and one or more wireless switches connected to the public switched telephone network." |

Zoove's revised construction for the term "wireless network" differs significantly from its original proposed construction. And the parties' revised constructions differ significantly from each other. Zoove's construction includes the three concepts not touched upon in SITO's construction: (1) "the portion of" a telecommunications network; (2) "one or more cellular towers"; and (3) "connected to the public switched telephone network." None of these concepts was part of either party's original construction, nor were these concepts addressed in either party's briefing or arguments at the hearing.

As a result, the Court is not in a position to construe the term. The Court therefore declines to construe the term "wireless network"/ "wireless telecommunications network."[7]

//

//

//

//

---

[7] The Court notes that the parties appear to agree that the term may be construed, in part, to mean "a telecommunications network that includes one or more switches and one or more base stations/ base station controllers." The Court makes no finding as to the propriety of these parts of the construction at this time.

United States District Court
Northern District of California

**VII. SEVENTH DISPUTED TERM: "WIRELESS SWITCH"**

**A. BACKGROUND**

The term "wireless switch" is only used in the claims at issue in the '341 Patent, though it appears in the specification of the '716 Patent. Claim 1 of the '341 Patent is exemplary of the usage of the term "wireless switch" in the claim terms, and states, in part, as follows:

> A system for providing information to a wireless telecommunications transmitting and receiving device, the system comprising:
> a **wireless switch** to:
> receive a communication from the wireless telecommunications transmitting and receiving device, the communication comprising a specialized access code, wherein the specialized access code has fewer characters than an ordinary telephone number and comprises a non-alphabetic/non-numeric character as a first character, and wherein the communication further includes information regarding a customer including both customer identification and information beyond customer identification; and
> determine a route for directing the communication…

('341 Patent, 13:38-52 (emphasis added).)

| SEVENTH DISPUTED TERM: "WIRELESS SWITCH" | |
|---|---|
| ***SITO's Construction*** | ***Zoove's Construction*** |
| **Original construction:** "processor with software in a cellular telecommunication network to receive and route communications." | **Original construction:** "a wireless switch that must recognize the caller identity, determine the billing status of and modify billing procedures for the caller, and recognize the [specialized] access code and compare it to entries in a database of approved codes." |
| **Revised construction:** "a processor with software in a cellular telecommunications network for receiving a communication from a cellular telephone and determining a route for directing the communications" | **Revised construction:** "a wireless switch that must recognize the caller's identity, modify billing procedures as needed, recognize the access code and compare it to entries in a database of approved codes, convert the access code to an 800-telephone number, and route the communication to the fulfillment center over the public switched telephone network or only the wireless network." |

In its briefing, SITO argued that its (original) proposed construction addressed two key elements: (1) what the switch is, *i.e.* a processor with software in a cellular network; and (2) the

24

function of the wireless switch as defined by the independent claims, *i.e.* to receive and route communications.  SITO's revised construction does not vary significantly from these essential elements.

Zoove's construction, by contrast, first uses the term to be construed within the definition ("wireless switch"), and then goes on to list a number of functions: (*i*) recognize the caller's identity; (*ii*) modify billing procedures as needed; (*iii*) recognize the access code and compare it to entries in a database of approved codes; (*iv*) convert the access code to an 800-telephone number; and (*v*) route the communication to the fulfillment center over the public switched telephone network or only the wireless network.  While the language of Claim 1 itself lists a number of functions the switch must perform, none of them completely align with the functions in Zoove's proposed construction. Instead, the functions are taken from the language of the detailed description in the specification.

SITO acknowledged at the hearing that the "functionality that's required by the claims" is described in the specification at column 4, lines 50-66.  (*See* TR. 108:23-109:9.)  Again, this portion of the specification describes the functioning of the "wireless switch" as "[c]entral to the operation of the inventive system.  ('341 Patent, Col. 4:50-51.)  Thereafter, the specification states that:

> This switch must <u>recognize the caller</u> seeking to utilize the system and must <u>recognize the access code and compare it to entries in a database of approved codes</u>.  The switch **112** also performs recognition on the subscriber identity and the subscriber location, and <u>determines the billing status</u> for the caller as either a local system user or a roaming user (billing detail is provided in FIGS. 7 and **11**).  Depending upon the billing status determination (i.e., local or roaming), software or firmware at the switch is utilized to <u>modify established billing procedures</u> and to create a new billing record for the third party provider of the service under a preset billing arrangement.  Alternatively, if the system determines that the caller is roaming and the caller's service provider has not arranged to allow treatment of the call as local, the system queries the caller if the caller will agree to be billed for all airtime charges.  Absent caller acceptance of billing responsibility, access to the system is blocked…
>
> Assuming favorable determinations with respect to verification of the input access code, of subscriber identity, and of caller billing, switch **112** <u>converts the access code to a land line 800-number</u> and <u>routes the call to the PSTN's central office,</u> illustrated as block **113.**

('341 Patent, Col. 4:51-66, Col. 5:4-8, emphasis added.)

As above, Zoove maintains that its construction of "wireless switch" reiterates the language used by the patentee to describe not merely possible embodiments but the actual invention itself. *See Verizon Servs. Corp.*, 503 F.3d at 1308; *Andersen Corp.*, 474 F.3d at 1367-68.

SITO argues that limitations in the specification, even if they are describing a preferred embodiment, cannot be used to limit the claims. SITO initially argued that a broad construction – "processor with software in a cellular telecommunication network" – captured the meaning of the claim term, and that the functional limitations Zoove included in its construction improperly imported limitations described only in the dependent claims. However, in revising its proposed construction, SITO apparently concedes that some functional description is necessary to the proper construction of these terms.

Comparing the revised constructions, the Court first notes that the parties are in apparent agreement that the switch must be capable of determining a route for the communication, a requirement consistent with the language of Claim 1 itself.

Second, the Patent specification demonstrates that certain of the functions in Zoove's proposed revised construction are essential to the construction of the claim term. Contrary to SITO's arguments, two of the functions listed in Zoove's proposed construction are not redundant of any functions separately stated in the dependent claims, those being: recognize the caller's identity and recognize the access code and compare it to entries in a database of approved codes. Moreover, the specification states that the switch "must" be able to do two things: "[t]his switch ***must*** <u>recognize the caller</u> seeking to utilize the system and ***must*** <u>recognize the access code and compare it to entries in a database of approved codes</u>." ('341 Patent, Col.4:51-53, emphasis added.) The Court finds that these two functions are essential to the invention, not merely one embodiment. These functions are properly read into the construction of the term "wireless switch." *See Retractable Technologies, Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011) *cert. denied,* 133 S. Ct. 833 (U.S. 2013) and *cert. denied,* 133 S. Ct. 833 (U.S. 2013) (broad independent claims construed to be limited where, although limiting language only appeared in dependent claims, specification demonstrated that the invention could not be accomplished without such limitation; claim construction must be tethered "to what the specifications indicate the inventor actually invented"). Thus, any "switch" must be capable of carrying out at least these two functions.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Third, with respect to the function of converting the access code to a landline 800-number,

2 the specification provides that such a conversion is performed "[a]ssuming favorable determinations

3 with respect to verification of the input access code, of subscriber identity, and of caller billing."

4 ('341 Patent, Col. 5:4-6.)  More significantly, the specification acknowledges that it may be possible

5 to route calls and connect to the target center using only the wireless network, that is, without using a

6 landline 800-number.  ('341 Patent, Col. 4:34-37.)  Therefore the Court reads this function as one

7 that is not essential to the system, but merely part of one embodiment.[8]

8    As a result, the Court finds that the following functions are essential to the meaning of the

9 term "wireless switch" as used in the '341 Patent: recognize the caller's identity;  recognize the

10 access code and compare it to entries in a database of approved codes; and determine a route for the

11 communication.

***THE COURT'S CONSTRUCTION:***

12

13    Based upon the foregoing, the Court concludes that the term "wireless switch" in the '341

14 Patent, Claims 1, 8, and 10, should be construed as:

15    *a processor in a cellular telecommunications network that can recognize the caller's identity;*

16 *recognize the access code and compare it to entries in a database of approved codes; and determine*

17 *a route for the communication.*

18 //

19 //

20 //

21 //

22 //

23 //

24 //

25 //

26

27    [8]  Similarly, the function of determining the billing status and modifying the billing
procedures for the caller, while included in the preferred embodiment, is redundant of a dependent

28 claim of Independent Claim 10.  (*See* '341 Patent, Claim 38, Col. 16:32-34.)  The Court cannot find
this function essential either.

# CONCLUSION

For the reasons set forth above, the Court **ORDERS** as follows with respect to the disputed claim terms/phrases:

| DISPUTED CLAIM TERM/PHRASE | CONSTRUCTION |
|---|---|
| "access code" / "specialized access code" | *Abbreviated dialing code to access a fulfillment center/system* |
| "customer identification"/ "customer identifier" | *information that identifies the cellular telephone accessing the system and the customer associated with the particular device.* |
| "fulfillment center" | Does not require construction |
| "information beyond customer identification" / "information other than customer identification" | The Court declines to construe due to insufficient information. |
| "product identifier" / "advertiser identifier" | *an alphanumeric code to select a particular advertiser/product that is input after the access code.* |
| "wireless network" /  "wireless telecommunications network" /  "public wireless telecommunications network" | Count cannot construe -- revised too greatly from original proposals |
| "wireless switch" | *a processor in a cellular telecommunications network that can recognize the caller's identity; recognize the access code and compare it to entries in a database of approved codes; and determine a route for the communication.* |

The Court **SETS** this matter for a Further Case Management Conference on **Monday, August 26, 2013, at 2:00 p.m.**  The parties shall file an updated Joint Case Management Statement no later than August 19, 2013.

**IT IS SO ORDERED.**  This Order terminates Docket No. 52.

Date:  July 17, 2013

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

United States District Court
Northern District of California